**SCREEN GEMS–COLUMBIA MUSIC, INC., et al., Plaintiffs,**

v.

**MARK–FI RECORDS, INC., et al., Defendants.**

No. 63 Civ. 1459.

United States District Court, S. D. New York.

Feb. 8, 1971.

Abeles & Clark, New York City, for plaintiffs; Robert C. Osterberg, New York City, of counsel.

Burton Ritter, New York City, for defendants Metlis & Lebow Corp. and Monte Bruce.

## OPINION

McLEAN, District Judge.

This is an action to recover statutory royalties under Sections 1(e) and 101(e) of the Copyright Act (17 U.S.C. §§ 1(e), 101(e)).[1] It was tried before me without a jury. Of all of the defendants named in the caption, only two, Metlis & Lebow Corp. (Metlis) and Monte Bruce, stood trial. Some of the others had previously settled with plaintiffs, one had obtained summary judgment in his favor, and two others, Mark-Fi Records, Inc. (Mark-Fi) and Tony Alamo, were never served. I find the facts to be as follows.

Each of the four plaintiffs owns a registered copyright on a musical composition entitled respectively "I Love How You Love Me," "Just Keep It Up (and See What Happens)," "Could This Be Magic," and "Angel Baby." Each plaintiff has filed in the Copyright Office the notice required by Section 1(e) of a copyright owner who uses a musical composition, or licenses others to do so, for the manufacture of "parts of instruments serving to reproduce mechanically the musical work," i. e., phonograph records.

Mark-Fi, operated and controlled by Alamo, manufactured and sold a record entitled "20 Original Hits," which contained, among other songs, the four

1. The complaint also asks for injunctive relief but plaintiffs withdrew that request at the trial.

works owned by plaintiffs. Plaintiffs did not license Mark-Fi or Alamo to do so. Neither Mark-Fi nor Alamo, nor anyone else on their behalf, paid any royalties to plaintiffs. They "pirated" the songs and infringed plaintiffs' copyrights. When this action was begun, Alamo could not be found for service of process. Mark-Fi, said to be a California corporation, had no place of business in New York and could not be found either.

Metlis is an advertising agency doing business in New York. Between October 1962 and February 1963, it arranged for radio advertising for Alamo's record. Bruce was the employee of Metlis who introduced Alamo to the agency and handled his account. Bruce is no longer employed by Metlis and seems to have disappeared also. At any rate, his attorney stated at the trial that he had not seen Bruce in the last five years. Metlis' attorney had originally filed an answer for Bruce and at the court's request he continued to represent him at the trial in order to avoid a default judgment against him.

When Bruce introduced Alamo to the head of the advertising agency, Sanford H. Metlis, Metlis asked Alamo "if he had releases for the 20 songs." Alamo produced four documents, three of which are substantially identical except for the names. These three are undated agreements in the form of letters from "MARK-FI RECORDS, By Tony Alamo," addressed respectively to Grelmark Records with respect to "I Love How You Love Me," Roulette Records Inc. with respect to "Could This Be Magic," and Kerwood Records Inc. with respect to "Angel Baby." The three companies named were apparently the makers of the "master recording" from which individual records were subsequently made. Each agreement provided in substance that the manufacturer of the master recording "leased" the recording "and the performance embodied thereon," to Mark-Fi, for which Mark-Fi agreed to pay a specified sum "for every retail album sold." In the case of two of the three agreements, this sum was two cents per album, and in the third, although the illegibility of the exhibit makes it difficult to be sure, the sum appears to be three cents per album. Each agreement further provided that "you," i. e., the manufacturer of the master recording, "shall be solely responsible for the payment of all necessary mechanical license royalties to publishers." The parties agree that this phrase refers to the statutory royalties payable under Section 1(e) to the owner of the copyright on the song, which is two cents per record.

The fourth document is a much shorter letter dated October 25, 1962, from Vee Jay Records, Inc. to Alamo authorizing Alamo to "use for the purpose of Leasing on Long Playing records" the master of "Just Keep It Up." This letter says nothing about "necessary mechanical license royalties to publishers."

Metlis did not ask Alamo for any further evidence of his authority to manufacture and sell his record. Metlis obtained nothing but the letters previously mentioned.

Metlis agreed to act for Alamo on a strictly cash in advance basis. Since Alamo at the time had no office in New York and no telephone, Metlis permitted him to use Metlis' telephone and Metlis' office as a mailing address until Alamo obtained an address and telephone of his own, which he eventually did.

The work which Bruce did for Metlis concededly was within the scope of his employment. It consisted in the first instance of editing the text of an advertising announcement, arranging for this to be transcribed on tape, and arranging with radio stations to broadcast it. Bruce also prepared a supplemental advertisement or "tag" and hired an announcer to record it for use when it was not read "live" on radio.

Up to this point, Bruce's services would appear to be the normal activities of an advertising representative. But Bruce did more than this. He arranged for telephone answering services to receive and record orders for Alamo's

record placed in response to the broadcast announcements. He arranged for a mailing company to fill those orders by mailing out the records. He furnished the labels for the records and ordered the corrugated boxes in which they were mailed. He received regular reports of orders and rendered periodic reports of them to Alamo. On occasion, he received complaints from customers about a defective record or an unfilled order and took steps to see that the complaint was rectified. Toward the end of the period Metlis no longer insisted on receiving cash in advance from Alamo and advanced its own funds for his account in paying freight bills and other charges.

Metlis received its compensation primarily from its commissions, which were paid by the radio stations. There is some suggestion in the testimony that Metlis also made a charge to Alamo for "managerial services," but the evidence on this is vague and unsatisfactory.

All in all, Mark-Fi sold in this fashion 60,053 records, each of which contained all four songs. At two cents per record, statutory royalties for each plaintiff would amount to $1,201.06.[2]

In December 1969 or January 1970, three of the original defendants settled with plaintiffs. They were Advertising Distributors of America, Incorporated, the mailing company, and two radio companies, Westinghouse Broadcasting Company, Inc. and WMCA, Inc. Each of these defendants paid to the four plaintiffs, collectively, $1,000. This amounted to $250 per plaintiff for each defendant, or a total of $750 per plaintiff for the three defendants. Plaintiffs, by their authorized agent, delivered releases to these three defendants which reserved plaintiffs' rights against others. On various dates between February and April 1970, each of the three defendants consented to an injunction, without admission of liability, and without adjudication on the merits.

■ At an earlier stage of this litigation, Judge Weinfeld denied defendants' motion for summary judgment (except as to defendant Lebow individually) on the ground that triable issues of fact existed. Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc., 256 F. Supp. 399 (S.D.N.Y.1966). In doing so, he wrote an opinion which discussed the applicable law at length and cited many authorities. No purpose would be served by repeating that exposition here. Suffice it to say that, as Judge Weinfeld pointed out, the fundamental doctrine that one who knowingly participates in or furthers a tortious act is liable with the prime tortfeasor is applicable in suits for infringement under the Copyright Act. See 256 F.Supp. 399 at 403 and cases cited n. 9.

The work that Metlis performed for Mark-Fi and Alamo was a participation in and a furtherance of their infringement of plaintiffs' copyrights. If Metlis engaged in this work with knowledge of the fact that Mark-Fi and Alamo were infringers, Metlis is liable as an infringer for the statutory royalties.

I doubt that the evidence is strong enough to prove that Sanford H. Metlis himself, the head of the agency, had this guilty knowledge, although he seems to have been careless, to say the least, in failing to obtain from Alamo proof that plaintiffs had licensed Alamo to use their copyrights. The fact that three of the four manufacturers of the master recordings had purportedly agreed with Alamo to pay the "necessary mechanical license royalties to publishers" was not enough. Metlis in effect took his chances that these manufacturers would carry out their agreement, and in fact they did not.

■■ Bruce is a clearer case. He is the one who produced Alamo in the first place. He handled not only the advertising, but also the distribution of the records. Alamo apparently attended to their manufacture from the master

---

2. Plaintiffs claim that 61,576 records were sold, but after careful examination of the somewhat illegible exhibits, the court can find evidence only of 60,053.

recordings. The inference is permissible that Alamo and Bruce were in effect a partnership, working together. This inference is strengthened by Bruce's failure to appear at the trial and subject himself to cross-examination as to what he knew. I feel justified in finding on this record that Bruce was a knowing party to the piracy. His knowledge binds his employer. See Shapiro, Bernstein & Co. v. H. L. Green Company, 316 F.2d 304, 307 (2d Cir. 1963).

I conclude that defendants have infringed plaintiffs' copyrights.

The question remains as to whether plaintiffs must apply in partial satisfaction of their claims the amounts they have already received from the three defendants who settled, leaving the present defendants liable only for the balance. Section 15–103 of the New York General Obligations Law, McKinney's Consol. Laws, c. 24–A, provides:

> "The amount or value of any consideration received by the obligee from one or more of several obligors, or from one or more of joint, or of joint and several obligors, in whole or in partial satisfaction of their obligations, shall be credited to the extent of the amount received on the obligations of all co-obligors to whom the obligor or obligors giving the consideration did not stand in the relation of a surety."

In the first place, it is doubtful whether New York law applies to this action, which is brought to enforce an obligation arising under a federal statute. See Twentieth Century-Fox Film Corp. v. Winchester Drive-In Theatre, Inc., 351 F.2d 925 (9th Cir. 1965), cert. denied, 382 U.S. 1011, 86 S.Ct. 620, 15 L.Ed.2d 526 (1966); Miami Parts & Spring, Inc. v. Champion Spark Plug Co., 402 F.2d 83 (5th Cir. 1968).

■ In the second place, even assuming that New York law applies, I do not think that the $1,000 paid by each of the three defendants who settled can fairly be said to have been paid by them "in whole or in partial satisfaction of their obligations" within the meaning of the New York statute. These defendants did not admit any obligation to plaintiffs. They each paid $1,000 to buy their peace in this litigation. The $1,000 appears to have been an arbitrary sum, fixed without reference to what plaintiffs might be able to prove as to the amount of royalties due, either from the settling defendants or from Metlis and Bruce, amounts which are not necessarily the same. I conclude that plaintiffs are entitled to judgment against Metlis and Bruce for the full amount of royalties, i. e., $1,201.06, for each plaintiff. Under 17 U.S.C. § 116, plaintiffs are also entitled to costs.

■ Attorneys' fees, which plaintiffs also request, are discretionary. In view of the fact that in all probability the burden of this judgment will fall entirely on Metlis who, in a sense, was victimized by Alamo and Bruce, as plaintiffs were, and bearing in mind also the fact that by virtue of the settlement each plaintiff will wind up with a total recovery in excess of the statutory royalties, I believe that plaintiffs should pay their own attorneys' fees. See Shapiro, Bernstein & Co. v. Goody, 248 F.2d 260, 267 (2d Cir. 1957), cert. denied, 355 U.S. 952, 78 S.Ct. 536, 2 L.Ed.2d 529 (1958).

In the exercise of the court's discretion, attorneys' fees will not be allowed.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

The Clerk is directed to enter judgment in favor of plaintiffs in accordance with this opinion.

So ordered.