**COLUMBIA PICTURES INDUSTRIES, INC., Embassy Pictures, Paramount Pictures Corporation, Twentieth Century-Fox Film Corporation, Universal City Studios, Inc., Walt Disney Productions and Warner Bros., Inc., Appellees,**

v.

**REDD HORNE, INC., Maxwell's Video Showcase, Ltd., Glenn W. Zeny and Robert Zeny, Appellants.**

No. 83–5786.

United States Court of Appeals, Third Circuit.

Argued Aug. 14, 1984.

Decided Nov. 23, 1984.

Howard A. Hain (Argued), Galbo, Dailey, Resetifo, Held & Dailey, Erie, Pa., for appellants.

Robert L. Byer, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., Bancroft D. Haviland (Argued), Carole E. Handler, Nancy L. Schultz, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellees; Burton H. Hanft, Harvey L. Shapiro, Sargoy, Stein & Hanft, New York City, of counsel.

Before ALDISERT, Chief Judge, WEIS, Circuit Judge, and RE, Judge.*

## OPINION OF THE COURT

RE, Chief Judge.

In this copyright infringement case, defendants appeal from an order of the United States District Court for the Western District of Pennsylvania which granted the plaintiffs' motion for summary judgment, and enjoined defendants from exhibiting plaintiffs' copyrighted motion pictures. *Columbia Pictures Indus., Inc. v. Redd Horne Inc.*, 568 F.Supp. 494 (W.D.Pa.1983). The defendants, Redd Horne, Inc., Maxwell's Video Showcase, Ltd., Glenn W. Zeny and Robert Zeny, also appeal from the dismissal of their antitrust counterclaims, and from an award of damages against them in the amount of $44,750.00.

Defendant-appellants raise three questions on this appeal: (1) whether the activities of the defendant Maxwell's Video Showcase, Ltd., (Maxwell's) constitute an infringement of plaintiffs' copyright protections which would entitle the plaintiffs to injunctive relief and damages; (2) if so, whether the activities of the other defendants, Robert Zeny, the president and sole shareholder of Maxwell's, Redd Horne, Inc., Maxwell's advertising and public relations firm, and Glenn W. Zeny, the president of Redd Horne, Inc., and Robert Zeny's brother, are sufficient to hold each of them liable as co-infringers with Maxwell's; and (3) whether the antitrust counterclaims of the defendants were properly dismissed by the district court. Since we agree with the district court, we affirm.

### The Facts

Maxwell's Video Showcase, Ltd., operates two stores in Erie, Pennsylvania. At these two facilities, Maxwell's sells and rents video cassette recorders and prerecorded video cassettes, and sells blank video cassette cartridges. These activities are not the subject of the plaintiffs' complaint. The copyright infringement issue in this case arises from defendants' *exhibition* of video cassettes of the plaintiffs' films, or what defendants euphemistically refer to as their "showcasing" or "in-store rental" concept.

Each store contains a small showroom area in the front of the store, and a "showcase" or exhibition area in the rear. The front showroom contains video equipment

---

* The Honorable Edward D. Re, Chief Judge, United States Court of International Trade, sitting by designation.

and materials for sale or rent, as well as dispensing machines for popcorn and carbonated beverages. Movie posters are also displayed in this front area. In the rear "showcase" area, patrons may view any of an assortment of video cassettes in small, private booths with space for two to four people. There are a total of eighty-five booths in the two stores. Each booth or room is approximately four feet by six feet and is carpeted on the floor and walls. In the front there is a nineteen inch color television and an upholstered bench in the back.

The procedure followed by a patron wishing to utilize one of the viewing booths or rooms is the same at both facilities. The customer selects a film from a catalogue which contains the titles of available films. The fee charged by Maxwell's depends on the number of people in the viewing room, and the time of day. The price is $5.00 for one or two people before 6 p.m., and $6.00 for two people after 6 p.m. There is at all times a $1.00 surcharge for the third and fourth person. The fee also entitles patrons to help themselves to popcorn and soft drinks before entering their assigned rooms. Closing the door of the viewing room activates a signal in the counter area at the front of the store. An employee of Maxwell's then places the cassette of the motion picture chosen by the viewer into one of the video cassette machines in the front of the store and the picture is transmitted to the patron's viewing room. The viewer may adjust the light in the room, as well as the volume, brightness, and color levels on the television set.

Access to each room is limited to the individuals who rent it as a group. Although no restriction is placed on the composition of a group, strangers are not grouped in order to fill a particular room to capacity. Maxwell's is open to any member of the public who wishes to utilize its facilities or services.

Maxwell's advertises on Erie radio stations and on the theatre pages of the local newspapers. Typically, each advertisement features one or more motion pictures, and emphasizes Maxwell's selection of films, low prices, and free refreshments. The advertisements do not state that these motion pictures are video cassette copies. At the entrance to the two Maxwell's facilities, there are also advertisements for individual films, which resemble movie posters.

*Infringement of Plaintiffs' Copyright*

It may be stated at the outset that this is not a case of unauthorized taping or video cassette piracy. The defendants obtained the video cassette copies of plaintiffs' copyrighted motion pictures by purchasing them from either the plaintiffs or their authorized distributors. The sale or rental of these cassettes to individuals for home viewing is also not an issue. Plaintiffs do not contend that in-home use infringes their copyright.

The plaintiffs' complaint is based on their contention that the exhibition or showing of the video cassettes in the private booths on defendants' premises constitutes an unauthorized public performance in violation of plaintiffs' exclusive rights under the federal copyright laws.

■■■ It is acknowledged that it is the role of the Congress, not the courts, to formulate new principles of copyright law when the legislature has determined that technological innovations have made them necessary. *See, e.g., Sony Corp. v. Universal City Studios, Inc.,* — U.S. ——, 104 S.Ct. 774, 783, 78 L.Ed.2d 574 (1984); *Teleprompter Corp. v. CBS,* 415 U.S. 394, 414, 94 S.Ct. 1129, 1141, 39 L.Ed.2d 415 (1974). In the words of Justice Stevens, "Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably implicated by such new technology." *Sony Corp., supra,* 104 S.Ct. at 783. A defendant, however, is not immune from liability for copyright infringement simply because the technologies are of recent origin or are being applied to innovative uses. Although this case involves a novel application of relatively recent technological developments, it can nonetheless be readily analyzed and re-

solved within the existing statutory framework.

Section 106 of the Copyright Act confers upon the copyright holder certain exclusive rights. This section provides:

> Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
>
> (1) to reproduce the copyrighted work in copies or phonorecords;
>
> (2) to prepare derivative works based upon the copyrighted work;
>
> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending.
>
> (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and *motion pictures and other audiovisual works, to perform the copyrighted work publicly;* and
>
> (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.

17 U.S.C. § 106 (1982) (emphasis supplied).

 It is undisputed that the defendants were licensed to exercise the right of distribution. *Id.* § 106(3). A copyright owner, however, may dispose of a copy of his work while retaining all underlying copyrights which are not expressly or impliedly disposed of with that copy. *Id.* § 202. Thus, it is clear that the plaintiffs have retained their interest in the other four enumerated rights. *See* M. Nimmer, 2 Nimmer on Copyright § 8.01[A], at 8–11 to 8–12 (1983) (citing *Interstate Hotel Co. v. Remick Music Corp.,* 157 F.2d 744 (8th Cir.1946)). Since the rights granted by section 106 are separate and distinct, and are severable from one another, the grant of one does not waive any of the other exclusive rights. Thus, plaintiffs' sales of video cassette copies of their copyrighted motion pictures did not result in a waiver of any of the other exclusive rights enumerated in

section 106, such as the exclusive right to perform their motion pictures publicly. In essence, therefore, the fundamental question is whether the defendants' activities constitute a public performance of the plaintiffs' motion pictures. We agree with the conclusion of the district court that these activities constitute a public performance, and are an infringement.

"To perform a work means ... in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible." 17 U.S.C. § 101 (1982). Clearly, playing a video cassette results in a sequential showing of a motion picture's images and in making the sounds accompanying it audible. Thus, Maxwell's activities constitute a performance under section 101.

The remaining question is whether these performances are public. Section 101 also states that to perform a work "publicly" means "[t]o perform ... it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered." *Id.* The statute is written in the disjunctive, and thus two categories of places can satisfy the definition of "to perform a work publicly." The first category is self-evident; it is "a place open to the public." The second category, commonly referred to as a semi-public place, is determined by the size and composition of the audience.

The legislative history indicates that this second category was added to expand the concept of public performance by including those places that, although not open to the public at large, are accessible to a significant number of people. *See* H.R.Rep. No. 1476, 94th Cong., 2d Sess. 64, *reprinted in,* 1976 U.S.Code Cong. & Ad.News 5659, 5677–78 (hereinafter cited as *House Report*). Clearly, if a place is public, the size and composition of the audience are irrelevant. However, if the place is not public, the size and composition of the audience will be determinative.

We find it unnecessary to examine the second part of the statutory definition because we agree with the district court's conclusion that Maxwell's was open to the public. On the composition of the audience, the district court noted that "the showcasing operation is not distinguishable in any significant manner from the exhibition of films at a conventional movie theater." 568 F.Supp. at 500. Any member of the public can view a motion picture by paying the appropriate fee. The services provided by Maxwell's are essentially the same as a movie theatre, with the additional feature of privacy. The relevant "place" within the meaning of section 101 is each of Maxwell's two stores, not each individual booth within each store. Simply because the cassettes can be viewed in private does not mitigate the essential fact that Maxwell's is unquestionably open to the public.

The conclusion that Maxwell's activities constitute public performances is fully supported by subsection (2) of the statutory definition of public performance:

> (2) to transmit or otherwise communicate a performance ... of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance ... receive it in the same place or in separate places and at the same time or at different times.

17 U.S.C. § 101 (1982). As explained in the House Report which accompanies the Copyright Revision Act of 1976, "a performance made available by transmission to the public at large is 'public' even though the recipients are not gathered in a single place.... The same principles apply whenever the potential recipients of the transmission represent a limited segment of the public, such as the occupants of hotel rooms ...." *House Report, supra,* at 64–65, U.S.Code Cong. & Admin.News, p. 5678. Thus, the transmission of a performance to members of the public, even in private settings such as hotel rooms or Maxwell's viewing rooms, constitutes a public performance. As the statutory language and legislative history clearly indi-

cate, the fact that members of the public view the performance at different times does not alter this legal consequence.

Professor Nimmer's examination of this definition is particularly pertinent: *"if the same copy ... of a given work is repeatedly played (i.e., 'performed') by different members of the public, albeit at different times, this constitutes a 'public' performance."* 2 M. Nimmer, § 8.14[C][3], at 8–142 (emphasis in original). Indeed, Professor Nimmer would seem to have envisaged Maxwell's when he wrote:

> one may anticipate the possibility of theaters in which patrons occupy separate screening rooms, for greater privacy, and in order not to have to await a given hour for commencement of a given film. These too should obviously be regarded as public performances within the underlying rationale of the Copyright Act.

*Id.* at 8–142. Although Maxwell's has only one copy of each film, it shows each copy repeatedly to different members of the public. This constitutes a public performance.

### The First Sale Doctrine

██ The defendants also contend that their activities are protected by the first sale doctrine. The first sale doctrine is codified in section 109(a) of Title 17. This section provides:

> Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord.

17 U.S.C. § 109(a) (1982). Section 109(a) is an extension of the principle that ownership of the material object is distinct from ownership of the copyright in this material. *See* 17 U.S.C. § 202 (1982). The first sale doctrine prevents the copyright owner from controlling the future transfer of a particular copy once its material ownership has been transferred. *See, e.g., Bobbs-Merrill*

**160**

Co. v. Straus, 210 U.S. 339, 350, 28 S.Ct. 722, 726, 52 L.Ed. 1086 (1908); *Independent News Co. v. Williams,* 293 F.2d 510, 515–17 (3d Cir.1961). The transfer of the video cassettes to the defendants, however, did not result in the forfeiture or waiver of all of the exclusive rights found in section 106. *See, e.g., United States v. Moore,* 604 F.2d 1228, 1232 (9th Cir.1979); *United States v. Wise,* 550 F.2d 1180, 1187 (9th Cir.), *cert. denied,* 434 U.S. 929, 98 S.Ct. 416, 54 L.Ed.2d 290 (1977). The copyright owner's exclusive right "to perform the copyrighted work publicly" has not been affected; only its distribution right as to the transferred copy has been circumscribed. *See United States v. Powell,* 701 F.2d 70, 72 (8th Cir.1983); *see generally* M. Nimmer, *supra,* at § 8.12[D].

In essence, the defendants' "first sale" argument is merely another aspect of their argument that their activities are not public performances. For the defendants' argument to succeed, we would have to adopt their characterization of the "showcasing" transaction or activity as an "in-store rental." The facts do not permit such a finding or conclusion. The record clearly demonstrates that showcasing a video cassette at Maxwell's is a significantly different transaction than leasing a tape for home use. Maxwell's never disposed of the tapes in its showcasing operations, nor did the tapes ever leave the store. At all times, Maxwell's maintained physical dominion and control over the tapes. Its employees actually played the cassettes on its machines. The charges or fees received for viewing the cassettes at Maxwell's facilities are analytically indistinguishable from admission fees paid by patrons to gain admission to any public theater. Plainly, in their showcasing operation, the appellants do not sell, rent, or otherwise dispose of the video cassette. On the facts presented, Maxwell's "showcasing" operation is a public performance, which, as a matter of law, constitutes a copyright infringement.

### Liability of Co-Defendants

Defendant-appellants, Robert Zeny, Glenn W. Zeny, and Redd Horne, Inc., challenge that part of the district court's order which holds them liable as co-infringers. We agree with the district court and affirm.

It is well settled that "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing activity of another, may be held liable as a 'contributory' infringer." *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.,* 443 F.2d 1159, 1162 (2d Cir.1971). An officer or director of a corporation who knowingly participates in the infringement can be held personally liable, jointly and severally, with the corporate defendant. *See, e.g., Samet & Wells, Inc. v. Shalom Toy Co.,* 429 F.Supp. 895, 903–04 (E.D.N.Y.1977), *aff'd without opinion,* 578 F.2d 1369 (2d Cir. 1978); *accord Donsco, Inc. v. Casper Corp.,* 587 F.2d 602, 605–07 (3d Cir.1978) (corporate officer held personally liable in unfair competition action).

Robert Zeny is the president and the sole shareholder of Maxwell's Video Showcase, Ltd. He knowingly initiated and participated in the infringing activity, and ignored repeated requests from the plaintiffs that he cease and desist the activity. He too, therefore, is clearly liable as a co-infringer.

Glenn W. Zeny, Robert's brother, is not a stockholder or officer, nor does he have a direct financial interest in Maxwell's Video Showcase, Ltd. Glenn W. Zeny, however, conducted negotiations and wrote letters, on Redd Horne, Inc., stationery, on behalf of Maxwell's and its predecessor corporation. Some of these letters on Redd Horne, Inc., stationery, refer to "our company" and "our concept" without mentioning Maxwell's. The impression conveyed by the letters is that Glenn Zeny and Redd Horne, Inc., are principals in the venture. Glenn W. Zeny, like his brother, participated knowingly and significantly in the infringing activity and ignored the plaintiffs' persistent requests that the activity cease.

■ Redd Horne, Inc., conducted all of the advertising and promotional work for Maxwell's. It also provided financial, accounting, and administrative services for Maxwell's. All of these services, and the advertising services in particular, contributed and, indeed, were essential to the copyright infringement. In addition, Glenn W. Zeny's knowledge of, and substantial participation in, the infringing activities may be imputed to his employer, Redd Horne, Inc. *See Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir.1963); *Screen Gems-Columbia Music, Inc., v. Mark-Fi Records, Inc.*, 327 F.Supp. 788, 792 (S.D.N.Y.1971), *rev'd on other grounds*, 453 F.2d 552 (2d Cir.1972). Thus, we hold that the substantial, knowing participation of Glenn W. Zeny and Redd Horne, Inc., was more than sufficient to hold them liable as co-infringers.

### The Defendants' Counterclaims

The appellants also appeal from the district court's dismissal of their antitrust counterclaims. In considering a motion to dismiss for failure to state a claim for which relief can be granted, the allegations in the complaint are to be liberally construed. A motion under F.R.C.P. 12(b)(6) should be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976) (*quoting Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)); *Miller v. American Tel. & Tel. Co.*, 507 F.2d 759, 761 (3d Cir.1974). Construing the complaint liberally, we can find no allegations of fact which, if proven, would constitute a violation of the antitrust laws. Therefore, we affirm the district court's dismissal of the counterclaims.

Count I of the defendants' counterclaim alleges a "combination and conspiracy in restraint of trade in violation of the Anti-Trust laws." The facts alleged in support of this claim, however, amount to nothing more than an effort by the plaintiffs to enforce their rights under the copyright laws.

■ It is not a violation of the antitrust laws for parties with common interests to utilize the courts to protect their business or economic interests from competitors. *See, e.g., California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510–11, 92 S.Ct. 609, 611–12, 30 L.Ed.2d 642 (1972); *United Mine Workers v. Pennington*, 381 U.S. 657, 669–70, 85 S.Ct. 1585, 1592–93, 14 L.Ed.2d 626 (1965); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136–38, 81 S.Ct. 523, 528–30, 5 L.Ed.2d 464 (1961). More specifically, a good faith attempt to enforce a copyright does not violate the antitrust laws. *Edward B. Marks Music Corp. v. Colorado Magnetics, Inc.*, 497 F.2d 285, 290 (10th Cir.1974); *Alberto-Culver Co. v. Andrea Dumon, Inc.*, 466 F.2d 705, 711 (7th Cir.1972). Only when resort to the courts is in bad faith and a "mere sham" may antitrust liability be imposed. *California Motor Transp.*, 404 U.S. at 511, 92 S.Ct. at 612 (quoting *Noerr*, 365 U.S. at 144, 81 S.Ct. at 533).

■ In their brief, the appellants admit that the "basis of the counterclaims are [sic] quite simply that there is no good faith underlying the plaintiff's [sic] actions ...." However, the plaintiffs' success on the merits of their copyright infringement action demonstrates clearly that plaintiffs possessed valid causes of action under the copyright laws which they had the legal right to enforce. Hence, it would be impossible for the appellants to prove bad faith, and the first count of the counterclaim must fail.

■ The second count of the defendants' counterclaim alleges that the actions of the plaintiffs constitute an "unlawful tying arrangement." A tying arrangement "may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that prod-

**162**

uct from any other supplier." *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518–519, 2 L.Ed.2d 545 (1958). *See Ungar v. Dunkin' Donuts, Inc.,* 531 F.2d 1211, 1218 (3d Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976). To establish liability, the plaintiff in a "tying" case must also prove that the seller has "sufficient economic power with respect to the tying product to appreciably restrain competition in the market for the tied product," and that "a 'not insubstantial' amount of interstate commerce is affected." *Ungar, supra,* at 1244 (*quoting Northern Pacific, supra,* 356 U.S. at 5, 78 S.Ct. at 518). In short, a tying arrangement requires that a seller with sufficient economic power in the tying product coerce the buyer into also buying an unwanted "tied" product. *See Ungar, supra,* at 1222. The plaintiffs in this case have declined to allow Maxwell's to exhibit their copyrighted works in its stores. They have not attempted to tie any other product to the sale of their video cassettes. A tying arrangement requires two products. Since there is only one in this case, the second count of the counterclaim must also fail.

### Conclusion

In view of the foregoing, it is the holding of this Court that the defendants' activities constituted an unauthorized, and, therefore, an unlawful public performance of the plaintiffs' copyrighted motion pictures. We also conclude that the activities of each named defendant were sufficient to hold each jointly and severally liable for the copyright infringement. In addition, we hold that the defendants' counterclaims were properly dismissed.

The judgment of the district court, therefore, will be affirmed.