847 F.2d 1093
 10 ITRD 1321, 56 USLW 2697, 1988
Copr.L.Dec. P 26,284,
7 U.S.P.Q.2d 1077
 SEBASTIAN INTERNATIONAL, INC.
v.
CONSUMER CONTACTS (PTY) LTD., d/b/a 3-D Marketing Services,
Hiltexan Ltd., Fabric Limited, Quality King
Manufacturing, Inc. and Quality King
Distributors, Inc.
Appeal of HILTEXAN LTD. and Fabric Limited.
 No. 87-5439.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 19, 1988.
Decided May 25, 1988.
 
 Ina B. Lewisohn (argued), Melvin Greenberg, Steven D. Scharfetter, Greenberg, Dauber & Epstein, Newark, N.J., for appellants Fabric Limited and Hiltexan Ltd.
 Robert A. Weiner (argued), David B. Wechsler, Berger & Steingut, New York City, Shanley & Fisher, Morristown, N.J., for appellee Sebastian Intern., Inc.
 Weil, Gotshal & Manges, New York City (R. Bruce Rich, Stuart D. Levi, of counsel), Thomas J. Donegan, Jr., Marsha W. Gardner, The Cosmetic, Toiletry and Fragrance Ass'n, Inc., Washington, D.C., for amicus curiae The Cosmetic, Toiletry and Fragrance Ass'n, Inc.
 John B. McCrory, Nixon, Hargrave, Devans & Doyle, Washington, D.C., for amicus curiae The Coalition For Competitive Imports.
 Before GIBBONS, Chief Judge, WEIS and GREENBERG, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.*
 
 
 1
 This case comes to us in the guise of an alleged copyright infringement but, in reality, is an attempt by a domestic manufacturer to prevent the importation of its own products by the "gray market." We conclude that, having sold its goods with copyrighted labels to foreign distributors, the manufacturer is barred by the first sale doctrine from establishing infringement through an unauthorized importation. Consequently, we will vacate a preliminary injunction enjoining defendants from distributing within the United States, products that plaintiff had manufactured in this country and then exported.
 
 
 2
 Plaintiff, Sebastian International, is a California corporation which manufactures and markets personal care beauty supplies. The two items at issue here, WET and SHPRITZ FORTE, carry copyrights for the text and artistic content of their labels. Sebastian maintains that its marketing policy restricts retail sales to professional salons. This strategy is designed to establish Sebastian's image, enhance its reputation, and foster its commercial success.
 
 
 3
 In 1986, Sebastian entered into an oral contract with defendant Consumer Contacts (PTY), Ltd. d/b/a 3-D Marketing Services, in which 3-D agreed to distribute Sebastian beauty products to professional hair styling salons in South Africa, but not elsewhere. Sebastian shipped four containers of WET, SHPRITZ FORTE and other products valued at approximately $200,000 to 3-D in Edenvale, South Africa in January 1987. 3-D then reshipped the unopened containers back to the United States where customs released them on May 14, 1987.
 
 
 4
 One week later, Sebastian, alleging breach of contract, sought a preliminary injunction against distribution of the products in the United States. The district court granted a temporary restraining order and scheduled a hearing. Later Sebastian amended its complaint to allege that defendant Fabric, Ltd. had possession of the products, and that the copyrights on WET and SHPRITZ FORTE labels were being infringed.
 
 
 5
 When it became evident that Fabric had not known of the contractual limitations between Sebastian and 3-D, the district court lifted its initial restraining order. The court concluded, however, that the two Sebastian labels came within the purview of the Copyright Act and issued a preliminary injunction against infringement.
 
 
 6
 As the district court read the pertinent provisions of the Copyright Act of 1976, 17 U.S.C. Secs. 106(3), 109(a), 602(a), the copyright holder has a right to control importation of copies, regardless of where they were made and despite the occurrence of a "first sale." After surveying the limited case law and the legislative history, the court understood the 1976 Act to create two types of distribution rights for copies; one tied to the act of vending and the other to the act of importation. In the court's view, vending was limited by the first sale doctrine; importation was not. Thus, Sebastian's right to control importation was "not extinguished when those goods were first sold regardless of where plaintiff's products were first sold or first manufactured." Sebastian Int'l., Inc. v. Consumer Contact (PTY) Ltd., 664 F.Supp. 909, 920 (D.N.J.1987).
 
 
 7
 Defendants appeal the issuance of the preliminary injunction and present two issues for review. First, they contend that Sebastian did not demonstrate irreparable harm. Second, they argue that the first sale doctrine extinguishes the claim for copyright infringement. Defendants do not presently challenge the district court's determination that the labels had valid copyrights, having reserved that issue in the district court until the hearing on the permanent injunction. Consequently, that issue is not before us and in view of our disposition of this case, we do not discuss the irreparable injury aspect.
 
 I.
 
 8
 The Copyright Act is based on article I, section 8 of the United States Constitution, which grants Congress power to "Promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." These monopoly privileges are "neither unlimited nor primarily designed to provide a special private benefit." Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417, 429, 104 S.Ct. 774, 782, 78 L.Ed.2d 574 (1984). Instead, they promote an important public purpose by encouraging the creative activity of authors and by allowing public access to "the products of their genius after the limited period of exclusive control has expired." Id.
 
 
 9
 The copyright statutes have been amended repeatedly in an attempt to balance the authors' interest in the control and exploitation of their writings with society's competing stake in the free flow of ideas, information and commerce. Id. Ultimately, the copyright law regards financial reward to the owner as a secondary consideration.
 
 
 10
 The Copyright Act of 1976, 17 U.S.C. Secs. 101-810 (1982) (repealing Copyright Act of 1909, ch. 320, Sec. 41, 35 Stat. 1075), contains three sections relevant to the issues presented here. The first, 17 U.S.C. Sec. 106, states:
 
 
 11
 "Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and authorize any of the following:
 
 
 12
 (1) to reproduce the copyrighted work in copies ...
 
 
 13
 * * *
 
 
 14
 * * *
 
 
 15
 (3) to distribute copies ... to the public by sale or other transfer of ownership, or by rental, lease, or lending ..."
 
 
 16
 The distribution rights granted by subsection (3) are limited by the second provision, section 109(a), known as the "first sale" rule, which provides in pertinent part: "Notwithstanding the provisions of section 106(3), the owner of a particular copy ... lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy...."
 
 
 17
 The third provision, section 602(a), addresses importation and reads: "Importation into the United States, without the authority of the owner of copyright under this title, of copies ... of a work that have been acquired outside the United States is an infringement of the exclusive right to distribute copies ... under section 106...."
 
 A.
 
 18
 The first sale doctrine has a venerable lineage. The Supreme Court construed the right of exclusive sale held by copyright owners in Bobbs-Merrill Co. v. Straus, 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086 (1908), and decided that it did not create an additional prerogative enabling the holder to restrict future resales. The Court refused to find infringement when a retailer sold a novel at a price below that listed in the copyright notice, observing that copyright protection is wholly statutory and independent of any contractual rights. Because it had previously exercised the right to vend copies, the copyright owner could not retain any further control over subsequent sales. The Court phrased the issue in general terms, answering in the negative the question whether "the sole right to vend ... secure[s] to the owner of the copyright the right, after a sale of the book to a purchaser, to restrict future sales of the book at retail ...?" Id. at 350, 28 S.Ct. at 726.
 
 
 19
 In Columbia Pictures Indus. v. Redd Horne, Inc., 749 F.2d 154 (3d Cir.1984), we commented that section 109(a) "is an extension of the principle that ownership of the material object is distinct from ownership of the copyright in this material. The first sale doctrine prevents the copyright owner from controlling the future transfer of a particular copy once its material ownership has been transferred." Id. at 159 (citation omitted). See also Columbia Pictures Indus. v. Aveco, Inc., 800 F.2d 59, 64 (3d Cir.1986).
 
 
 20
 Similarly, the Court of Appeals for the Fifth Circuit wrote in American Int'l Pictures, Inc. v. Foreman, 576 F.2d 661, 664 (5th Cir.1978), "[a]fter the first sale of a copy the copyright holder has no control over the occurrence or conditions of further sales of it.... The first sale thus extinguishes the copyright holder's ability to control the course of copies placed in the stream of commerce."
 
 
 21
 In describing the scope of section 109, the Senate Judiciary Committee reported:
 
 
 22
 "Section 109(a) restates and confirms the principle that where the copyright owner has transferred ownership of a particular copy or phonorecord of his work, the person to whom the copy or phonorecord is transferred is entitled to dispose of it by sale, rental, or any other means. Under this principle, which has been established by the court decisions and section 27 of the present law, the copyright owner's exclusive right of public distribution would have no effect upon anyone who owns 'a particular copy or phonorecord lawfully made under this title' and who wishes to transfer it to someone else or to destroy it."
 
 
 23
 S.Rep. No. 983, 93d Cong., 2d Sess. 131 (1974), reprinted in 13 Omnibus Copyright Revision Legislative History (1977).
 
 
 24
 The first sale rule is statutory, but finds its origins in the common law aversion to limiting the alienation of personal property. See Burke & Van Heusen, Inc. v. Arrow Drug, Inc., 233 F.Supp. 881, 883 (E.D.Pa.1964); Colby, The First Sale Doctrine--The Defense That Never Was?, 32 J. Copyright Soc'y U.S.A. 77, 89 (1984). See also H.R.Rep. No. 987, 98th Cong., 2d Sess. 2, reprinted in 1984 U.S. Code Cong. & Admin.News 2898, 2899 ("the first sale doctrine has its roots in the English common law rule against restraints on alienation of property"); 2 M. Nimmer, The Law of Copyright Sec. 8.12 (1987).
 
 
 25
 There is, however, an economic reason for the rule as well. As the district court said in Burke & Van Heusen, "the ultimate question under the 'first sale' doctrine is whether or not there has been such a disposition of the copyrighted article that it may fairly be said that the copyright proprietor has received his reward for its use." 233 F.Supp. at 884. See Platt & Munk Co. v. Republic Graphics, Inc., 315 F.2d 847, 854 (2d Cir.1963). See also Cosmair, Inc. v. Dynamite Enters., Corp., No. 85-0651, slip op. (S.D.Fla. Apr. 9, 1985) (1985 WL 2209).
 
 B.
 
 26
 At first glance, section 602(a)--the importation clause--appears to clash with the first sale doctrine. We conclude, nonetheless, that the two provisions were intended to function interdependently and may be read in harmony with each other.
 
 
 27
 Section 602(a) creates an infringement of the exclusive right of distribution when copies acquired outside the United States are imported into this country without the copyright owner's permission. Congress added this section to the Copyright Act in 1976, responding to copyright holders who sought protection from unauthorized importation of copies.
 
 
 28
 Preliminary discussions leading to general revision of the copyright law continued for over twenty years, incorporated a series of major studies, and involved numerous meetings with representatives of interested parties. See Mills Music, Inc. v. Snyder, 469 U.S. 153, 159-61, 105 S.Ct. 638, 642-43, 83 L.Ed.2d 556 (1985). The hearings revealed the copyright owners' desire to prevent importation not only of "piratical copies" made without permission, but also of copies made by licensees in foreign countries. See Tyson & Parker, Parallel Importation of Copyrighted Phonorecords, 10 N.C.J. Int'l L. & Com. Reg. 397, 402-206 (1985); Note, Parallel Importing Under the Copyright Act of 1976, 17 N.Y.U.J.Int'l L. & Pol. 113, 134-137 (1984).
 
 
 29
 The House Judiciary Committee acknowledged this concern when it explained, "[s]ection 602 ... deals with two separate situations: importation of 'piratical' articles (that is, copies or phonorecords made without any authorization of the copyright owner), and unauthorized importation of copies or phonorecords that were lawfully made." H.R.Rep. No. 1476, 94th Cong., 2d Sess. 169, reprinted in 1976 U.S. Code Cong. & Admin.News 5659, 5785. Only the second situation is presented here.
 
 C.
 
 30
 The interrelationship between sections 602(a) and 109(a) may be interpreted in two possible ways, although neither is conclusively supported by the statutory language or legislative history. The first, and most sweeping, construction declares that in addition to the distribution rights conferred by section 106(3), section 602(a) grants copyright owners yet another distinct right--one that frees them from the first sale right of section 109(a), which otherwise limits section 106(3), and allows them to prevent the unauthorized importation of copyrighted copies. The district court adopted that view in this case.
 
 
 31
 The second interpretation reconciles sections 106(3) and 602(a) by reasoning that the importation prohibition does not enlarge the distribution rights, but serves only as a specific example of those rights subject still to the first sale limitation. This analysis poses a problem in the case of unauthorized imports of copies made abroad pursuant to a license restricting sales to a particular country. Although the domestic copyright holder undoubtedly would prefer to block such importation, the statutory language does not expressly authorize such control.
 
 
 32
 Early in the drafting deliberations for the 1976 Act, the Copyright Office argued against imposing "a territorial restriction in a private contract upon third parties with no knowledge of the agreement." Tyson & Parker, supra at 403 (quoting Staff of House Comm. on Copyright Law Revision, 87th Cong., 1st Sess., Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law (Register's Report) 126 (Comm. Print 1961). The Office, however, later changed its position on the scope of section 602(a), finally agreeing that both authorized and unauthorized copies should be covered. Tyson & Parker, supra at 404.
 
 
 33
 The appellate courts have had little occasion to analyze the interplay between the first sale doctrine of section 109(a) and the importation right of section 602(a), but the district courts have struggled with the problem in a number of situations. In Columbia Broadcasting Sys. v. Scorpio Music Distrib., 569 F.Supp. 47 (E.D.Pa.1983), aff'd without opinion, 738 F.2d 424 (3d Cir.1984), the district court found infringement when copies, produced and sold exclusively in the Philippines under a license agreement, were imported into the United States--where the plaintiff owned the sole distribution rights. The district court concluded that the words "lawfully made under this title" in section 109(a) grant first sale protection only to copies legally made and sold in the United States. Id. at 49.
 
 
 34
 In T.B. Harms Co. v. Jem Records, Inc., 655 F.Supp. 1575 (D.N.J.1987), the court also found infringement when phonorecords manufactured under license in New Zealand were imported into the United States. The court reached that conclusion despite the compulsory licensing provision applicable to phonorecords, commenting that the preliminary negotiations behind sections 602(a) and 115 did not furnish a reliable gauge of congressional intent. In particular, the court was wary of statements made by special interest groups and was reluctant to consider such views as expressions of the congressional intent shaping the Copyright Act.
 
 
 35
 A similar problem arose in Hearst Corp. v. Stark, 639 F.Supp. 970 (N.D.Cal.1986), when books lawfully made in England were imported into the United States, where the plaintiff held the copyrights. The district court, finding an infringement, decided that the first sale doctrine did not modify the importation restraints of section 602(a). Id. at 976-77.
 
 
 36
 In Nintendo of America, Inc. v. Elcon Indus., 564 F.Supp. 937 (E.D.Mich.1982), the court enjoined the defendants from distributing electronic audio-visual games made in Japan under a license expressly limited to the territories of Japan. The agreement prohibited importation into the United States, where the plaintiff owned all the distribution rights under copyright. But Cf. Neutrogena Corp. v. United States, No. 2:88-0566-1, slip op. (D.S.C. Apr. 5, 1988) (first sale defense available where goods manufactured in United States and sold to defendant by third party); Cosmair, Inc., slip op., (section 109 limits section 602 where products manufactured in the United States and re-imported).
 
 
 37
 Scorpio and Harms, although not binding on us, demonstrate a significant difference from the factual situation presented here. In those district court cases, the copies were produced abroad and the sales occurred overseas. The courts reasoned that the foreign origin of both manufacture and sale made the first sale doctrine inapplicable. However valid that interpretation of the "lawfully made under this title" language of section 109(a)--and we specifically do not pass upon it in this case--it does not affect our decision here.[1]
 
 II.
 
 38
 The facts, seen here in the context of the first sale doctrine, are not complex. We do not confront a license agreement or copies produced in a foreign country under that agreement by someone other than the owner; instead, this case centers on actual copies of labels printed in this country by the copyright owner. Sebastian produced and sold the same copies which it now seeks to control.
 
 
 39
 Under the first sale doctrine, when plaintiff made and then sold its copies, it relinquished all further rights "to sell or otherwise dispose of possession of that copy." Unquestionably that includes any right to claim infringement of the section 106(3) distributive rights for copies made and sold in the United States. With respect to future distribution of those copies in this country,[2] clearly the copyright owner already has received its reward through the purchase price.
 
 
 40
 Nothing in the wording of section 109(a), its history or philosophy, suggests that the owner of copies who sells them abroad does not receive a "reward for his work." Nor does the language of section 602(a) intimate that a copyright owner who elects to sell copies abroad should receive "a more adequate award" than those who sell domestically. That result would occur if the holder were to receive not only the purchase price, but a right to limit importation as well.
 
 
 41
 Consequently, we agree with the district court that the place of sale is not the critical factor in determining whether section 602(a) governs. We differ, however, with the district court's finding of infringement because, in our view, a first sale by the copyright owner extinguishes any right later to control importation of those copies.
 
 
 42
 Section 602(a) does not purport to create a right in addition to those conferred by section 106(3), but states that unauthorized importation is an infringement of "the exclusive [section 106(3) ] right to distribute copies." Because that exclusive right is specifically limited by the first sale provisions of Sec. 109(a), it necessarily follows that once transfer of ownership has cancelled the distribution right to a copy, the right does not survive so as to be infringed by importation.[3] The preliminary injunction was granted on the basis of an erroneous reading of the law and therefore must be vacated.
 
 
 43
 Although this case turns purely on copyright law, we recognize that the underlying "gray market," or "parallel importing," issues really are dominant. Various economic factors--including the manipulation of global currency standards--encourage transactions in which goods are produced in this country, shipped and sold to foreign concerns, and then returned to the United States for resale at less than the domestic prices.
 
 
 44
 This practice has led to complaints by manufacturers seeking a fair return on their costs of promotion and servicing of warranties in this country. Equally vocal are consumer advocates asserting the desirability of access to identical goods at lower costs. Because contractual remedies have proved inadequate, see Johnson & Johnson Products v. DAL Int'l Trading Co., 798 F.2d 100 (3d Cir.1986), domestic manufacturers now invoke the copyright law to advance their economic interests. This twist has created the anomalous situation in which the dispute at hand superficially targets a product's label, but in reality rages over the product itself. We think that the controversy over "gray market" goods, or "parallel importing," should be resolved directly on its merits by Congress, not by judicial extension of the Copyright Act's limited monopoly.
 
 
 45
 The order of the district court granting a preliminary injunction will be vacated, and the case will be remanded to the district court for disposition of the remaining issues.
 
 
 
 *
 At the time of oral argument on this case, the Honorable Joseph F. Weis, Jr., was an active circuit judge. Since that time, Judge Weis has assumed senior status
 
 
 [1]
 We confess some uneasiness with this construction of "lawfully made" because it does not fit comfortably within the scheme of the Copyright Act. When Congress considered the place of manufacture to be important, as it did in the manufacturing requirement of section 601(a), the statutory language clearly expresses that concern
 Furthermore, we note that it is trademark law that emphasizes the source of origin; copyright law focuses instead on originality of authorship. The Supreme Court has cautioned against applying doctrine formulated in one area to the other. See Sony Corp. of America v. Universal City Studios, 464 U.S. 417, 439 n. 19, 104 S.Ct. 774, 787 n. 19, 78 L.Ed.2d 574 (1984).
 
 
 [2]
 Plaintiff concedes this point in its brief. "Sebastian submits that Sec. 602(a) prohibits importation into the United States of products incorporating copyright materials irrespective of where the copies were manufactured, if as here (i) the importation is without the authority of the United States copyright owner and (ii) the "first sale" of the products does not occur in the United States." Br. for Appellee at 9
 
 
 [3]
 This situation differs from that in which a licensee manufactures the copy. In that instance, the copyright holder does not own the tangible copy