12-2786-cv; 12-2807-cv
WNET v. Aereo, Inc.; Am. Broad. Cos. v. Aereo, Inc.

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 16th day of July, two thousand thirteen.

PRESENT: DENNIS JACOBS,
                              **Chief Judge**,
            ROSEMARY S. POOLER,
            ROBERT A. KATZMANN,
            REENA RAGGI,
            RICHARD C. WESLEY,
            PETER W. HALL,
            DEBRA ANN LIVINGSTON,
            GERARD E. LYNCH,
            DENNY CHIN,
            RAYMOND J. LOHIER, JR.,
            SUSAN L. CARNEY,
            CHRISTOPHER F. DRONEY,
                              **Circuit Judges**.

- - - - - - - - - - - - - - - - - - - - - - - -x

WNET, Thirteen, Fox Television Stations, Inc., Twentieth Century Fox Film Corporation, WPIX, Inc., Univision Television Group, Inc., The Univision Network Limited Partnership, and Public Broadcasting Service,

            **Plaintiffs-Counter-Defendants-Appellants**,

v.                                                      **12-2786**

AEREO, Incorporated, FKA Bamboom Labs, Inc.,

        **<u>Defendants-Counter-Claimants-Appellees</u>.**

- - - - - - - - - - - - - - - - - - - - - -x

American Broadcasting Companies Inc., Disney Enterprises, Inc., CBS Broadcasting Inc., CBS Studios Inc., NBCUniversal Media, LLC, NBC Studios, LLC, Universal Network Television, LLC, Telemundo Network Group LLC, WNJU-TV Broadcasting LLC,

        **<u>Plaintiffs-Counter-Defendants-Appellants</u>,**

**v.**                             **12-2807**

AEREO, Inc.,

        **<u>Defendant-Counter-Claimant-Appellee</u>.**

- - - - - - - - - - - - - - - - - - - - - -x

**FOR PLAINTIFFS-APPELLANTS WNET, THIRTEEN, ET AL.:**    Paul M. Smith, Steven B. Fabrizio, Scott B. Wilkens, Matthew E. Price, Jenner & Block LLP, Washington, DC; Richard L. Stone, Amy M. Gallegos, Jenner & Block LLP, Los Angeles, CA.

**FOR PLAINTIFFS-APPELLANTS AM. BROAD. COS., INC., ET AL.:**    Bruce P. Keller, Jeffrey P. Cunard, Michael R. Potenza, Debevoise & Plimpton LLP, New York, NY.

**FOR DEFENDANT-APPELLEE:**    R. David Hosp, John C. Englander, Mark S. Puzella, Yvonne W. Chan, Erin M. Michael, Goodwin Procter LLP, Boston, MA;

2

Michael S. Elkin, Thomas P. Lane, Winston & Strawn LLP, New York, NY; Seth D. Greenstein, Constantine Cannon LLP, Washington, DC; Jennifer A. Golinveaux, Winston & Strawn LLP, San Francisco, CA.

**ORDER**

Following disposition of this appeal on April 1, 2013, Plaintiffs-Appellants filed petitions for rehearing in banc. An active judge of the Court requested a poll on whether to rehear the cases in banc. A poll having been conducted and there being no majority favoring in banc review, rehearing in banc is hereby **DENIED**.[1]

Denny Chin, Circuit Judge, joined by Richard C. Wesley, Circuit Judge, dissents by opinion from the denial of rehearing in banc.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, CLERK

---

[1] José A. Cabranes, Circuit Judge, was recused from consideration of the matter.

3

DENNY CHIN, Circuit Judge, joined by RICHARD C. WESLEY, Circuit Judge, dissenting from the denial of rehearing *en banc*.

Aereo, Inc. ("Aereo") captures over-the-air broadcasts of copyrighted television programs and retransmits them to subscribers by streaming them over the Internet. For a monthly fee, Aereo's customers -- members of the public -- may watch the programs live or record them for later viewing. Aereo retransmits the programming without authorization of the copyright holders and without paying a fee. The question is whether, by doing so, Aereo is infringing on the exclusive right of the copyright owners "to perform the copyrighted work publicly." 17 U.S.C. § 106(4).

Aereo argues that its transmissions are not "public" performances. Rather, Aereo contends, its transmissions are "private" performances because its system uses thousands of individual, dime-sized antennas that enable subscribers to make their own purportedly "unique" copies of the programming for retransmission back to themselves. Under this theory, Aereo maintains that it may, for example, stream the Super Bowl "live" to 50,000 subscribers and yet, because each subscriber has an individual antenna and a "unique" copy of the broadcast, these are not "public" but "private" performances.

Based on this Court's decision in *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008), *cert. denied*, 557 U.S. 946 (2009) (mem.) ("*Cablevision*"), the panel majority in these tandem cases accepted this argument and held that Aereo is not engaging in copyright infringement. *See WNET, Thirteen v. Aereo, Inc.*, 712 F.3d 676 (2d Cir. 2013). Now this Court has denied the petitions for rehearing *en banc*. I dissented from the majority's panel decision, 712 F.3d at 696, and I now dissent from the Court's denial of rehearing *en banc*.

First, we should consider the two cases *en banc* because they raise "a question of exceptional importance," Fed. R. App. P. 35(a)(2), and because "en banc consideration is necessary to secure or maintain uniformity of the court's decisions," *id.* R. 35(a)(1). Second, the text of the Copyright Act and its legislative history make clear that Aereo's retransmissions are public performances. Third, Aereo's reliance on *Cablevision* is misplaced because, in my view, *Cablevision* was wrongly decided. Finally, even assuming *Cablevision* was correctly decided, *Cablevision* has been misapplied by the majority and should not be extended to the circumstances of this case. I discuss each of these issues in turn.

## I.   *En Banc* Review

The petitions for rehearing should be granted because these cases merit *en banc* review.

### A.   *Question of Exceptional Importance*

Federal Rule of Appellate Procedure 35 provides that an *en banc* rehearing is appropriate if "the proceeding involves a question of exceptional importance."  Fed. R. App. P. 35(a)(2).  These cases present such a question.  Indeed, the panel majority's decision has already had a significant impact on the entertainment industry.

Industry observers predict that the decision will encourage other companies that retransmit public television broadcasts to seek elimination of, or a significant reduction in, their retransmission fees.[1]  Time Warner Cable has already announced its intention to look into adopting an Aereo-like system to avoid these fees entirely,[2] and Dish

---

[1]   *See* John M. Gatti & Crystal Y. Jonelis, *Second Circuit Deals Blow to Rights of Broadcasters Under the Copyright Act*, Intell. Prop. & Tech. L.J., July 2013, at 16, 18 ("This decision is a significant setback for broadcasters, who maintain that their works are being stolen by Aereo, and may very well embolden Aereo and other similar start-up ventures."); Tristan Louis, *Aereo:  The Future of TV Is Here Today*, Forbes, Apr. 13, 2013, *available at* http://www.forbes.com/sites/tristanlouis/2013/04/13/aereo-the-future-of-tv-is-here-today/.

[2]   *See* Steve Donohue, *Britt:  Aereo Could Help Time Warner Cable Stop Paying Retransmission-Consent Fees*, FierceCable, Apr. 26, 2012, http://www.fiercecable.com/story/britt-aereo-could-help-time-warner-cable-stop-paying-retransmission-consent/2012-04-26.

Network is in talks to acquire Aereo itself.[3]  To protect
their copyrighted material, FOX, Univision, and CBS have
reportedly threatened to move their free public broadcasts
to paid cable if Aereo is permitted to continue with its
service.[4]  CBS has already had discussions with cable
companies about taking its local signals off the air in the
New York metropolitan area to prevent Aereo from
retransmitting its broadcasts for free.[5]

   Meanwhile, Aereo has announced plans to expand to
twenty-two cities in 2013, including Boston, Atlanta,
Chicago, Washington, D.C., and Philadelphia.[6]  In February
2013, while still awaiting the panel's decision, Aereo

[3]   Christopher S. Stewart & William Launder, *Diller Wins a Broadcast-TV Clash*, Wall St. J., July 12, 2012, at B1, *available at* http://online.wsj.com/article/SB10001424052702303 644004577521362073162108.html; Janko Roettgers, *Does Dish Want To Buy Aereo?  Broadcasters Would Love To Know*, paidContent (April 4, 2013), http://paidcontent.org/2013/04/04/does-dish-want-to-buy-aereo-broadcasters-would-love-to-know.

[4]   *See* Louis, *supra* note 1; Aimee Ortiz, *Fox Threatens to Leave Network TV in Protest Over Aereo Lawsuit*, Christian Sci. Monitor, Apr. 11, 2013, *available at* http://www.csmonitor.com/ Innovation/Pioneers/2013/0411/Fox-threatens-to-leave-network-TV-in-protest-over-Aereo-lawsuit; Brian Stelter, *Broadcasters Circle Wagons Against a TV Streaming Upstart*, N.Y. Times, Apr. 9, 2013, *available at* http://www.nytimes.com/2013/04/10/business/media/ aereo-has-tv-networks-circling-the-wagons.html.

[5]   *See* Stetler, *supra* note 4.

[6]   *See* Press Release, Aereo, Inc., Aereo Announces Expansion Plans for 22 New U.S. Cities (Jan. 8, 2013), *available at* https://aereo.com/assets/marketing/mediakit/press_release_ 20130108.pdf.

cautiously expanded from New York City to the entire New York metropolitan area, which includes some parts of New Jersey, Connecticut, and Pennsylvania.[7]  Since the panel's decision was filed in April, Aereo has already expanded to the Boston and Atlanta markets and will expand to Chicago in September, making its services available to residents of Massachusetts, New Hampshire, Vermont, Georgia, Alabama, North Carolina, Illinois, and Indiana.[8]

In recent years, with greater competition from cable and the Internet, television broadcasters have come to rely more heavily on retransmission fees, rather than advertising revenue, to make their free public broadcasts profitable.[9]  In fact, as with newspaper companies, broadcasters are relying increasingly on subscriber fees to fund the creation of content.  The majority's decision,

---

[7]     *See* Press Release, Aereo, Inc., Aereo Announces Expansion of Consumer Access to Its Groundbreaking Technology Across the New York City Greater Metropolitan Area (Feb. 25, 2013), *available at* https://aereo.com/assets/marketing/mediakit/press_release_20130225.pdf.

[8]     *See* Press Release, Aereo, Inc., Aereo Announces Launch Date for Chicago (June 27, 2013), *available at* https://aereo.com/assets/marketing/mediakit/press_release_20130627.pdf; Press Release, Aereo, Inc., Aereo Sets Launch Date for Atlanta (May 14, 2013), *available at* https://aereo.com/assets/marketing/mediakit/press_release_20130514.pdf; Press Release, Aereo, Inc., Aereo Sets Launch Date for Boston (Apr. 23, 2013), *available at* https://aereo.com/assets/marketing/mediakit/press_release_20130423.pdf.

[9]     *See* Stelter, *supra* note 4.

which permits Aereo to retransmit television broadcasts without paying a fee, undermines this model. Indeed, the filing of this Court's decision on April 1, 2013 caused the share price for major media firms to drop because of the threat it posed to a vital source of their revenue.[10]

In a decision we issued last year, *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1585 (2013), we addressed the harm that would result from permitting a company (in that case, ivi) to stream copyrighted television programming over the Internet without licenses:

> Indeed, ivi's actions -- streaming copyrighted works without permission -- would drastically change the industry, to plaintiffs' detriment. The absence of a preliminary injunction would encourage current and prospective retransmission rights holders, as well as other Internet services, to follow ivi's lead in retransmitting plaintiffs' copyrighted programming without their consent. The strength of plaintiffs' negotiating platform and business model would decline. The quantity and quality of efforts put into creating television programming, retransmission and advertising revenues, distribution models and schedules -- all would be adversely affected. These harms would extend to other copyright holders of television programming. Continued live

---

[10] *See Signalled Out*, Economist, Apr. 13, 2013, *available at* http://www.economist.com/news/business/21576161-aereo-small-start-up-has-infuriated-television-executives-signalled-out.

> retransmissions of copyrighted television programming over the Internet without consent would thus threaten to destabilize the entire industry.

691 F.3d at 286 (citations omitted).  These concerns apply with equal force here.

## B. *Uniformity of the Court's Decisions*

*En banc* rehearing is also appropriate when "necessary to secure or maintain uniformity of the court's decisions."  Fed. R. App. P. 35(a)(1).  Here, the majority's decision conflicts with our precedent, as this Court has repeatedly acknowledged that activity similar to Aereo's constitutes copyright infringement.

In *ivi*, for example, although the issue was not even contested, we recognized that retransmitting copyrighted television programming by streaming it live over the Internet constituted a public performance in violation of the Copyright Act.  *See* 691 F.3d at 278, 286-87.  Similarly, in *United States v. American Society of Composers, Authors & Publishers*, 627 F.3d 64 (2d Cir. 2010) ("*ASCAP*"), *cert. denied*, 132 S. Ct. 366 (2011), where, again, the issue was not even contested, we observed that the streaming of a song, like the streaming of a "television or radio broadcast," is a public performance.  *Id.* at 74 (but holding that downloads of music do not constitute public performances).  Finally, in *Infinity Broadcast Corp.*

-7-

*v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998), it was undisputed that providing users with access to receivers connected to private phone lines -- arguably the equivalent of the individual antennas here -- so they could listen to public radio broadcasts in remote locations was a public performance. *Id.* at 106-07, 111-12.[11]

There is no substantive difference between what the retransmitters in *ivi*, *ASCAP*, and *Kirkwood* did and what Aereo does here. While Aereo argues that its purportedly individual antennas and unique copies render its performances private, the tiny antennas and copies are technologically superfluous. The majority's decision, if permitted to stand, casts doubt on all these cases.

## II. *Aereo's Service Violates the Copyright Act*

In my dissent from the panel majority's decision, I explained why Aereo's unlicensed retransmissions are illegal public performances under the Copyright Act. 712 F.3d at 697-701. I summarize those reasons here.

---

[11] *See also Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, No. CV 12-6921, 2012 WL 6784498, at *1, *3-6 (C.D. Cal. Dec. 27, 2012) (holding that a service "technologically analogous" to Aereo was publically performing television broadcasts by streaming them over the Internet); *Warner Bros. Entm't, Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1007-12 (C.D. Cal. 2011) (holding that allowing customers to "rent" a remote DVD player and stream movies over the Internet was a public performance); *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 192 F. Supp. 2d 321, 332 (D.N.J. 2002) (holding that streaming movie clips over the Internet was a public performance), *aff'd*, 342 F.3d 191 (3d Cir. 2003).

**A.    *The Language of the Statute***

The text of the Copyright Act makes clear that Aereo is infringing upon the broadcasters' exclusive right "to perform the copyrighted work[s] publicly."  17 U.S.C. § 106(4).  The Copyright Act defines "[t]o perform or display a work 'publicly'" as:

> (1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered [the "performance clause"]; or

> (2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times [the "transmit clause"].

*Id.* § 101.  To "transmit" a performance means "to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent."  *Id.*

Aereo's system fits squarely within the plain meaning of the transmit clause.  The system is a "device or process," which Aereo uses first to receive copyrighted images and sounds and then to transmit them to its

-9-

subscribers "beyond the place from which they are sent," that is, beyond the point of origination.  Its subscribers are strangers -- paying "members of the public"[12] -- and under the statute, it matters not whether they are receiving the images "in the same place or in separate places, [or] at the same time or at different times."  Under any reasonable construction of the statute, Aereo is performing the broadcasts publicly as it is transmitting copyrighted works "to the public."  Therefore, Aereo is committing copyright infringement within the plain meaning of the statute.

B.  *The Legislative History*

To the extent the statute is ambiguous, its legislative history supports the conclusion that Aereo is engaging in public performances.  In *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968), and *Teleprompter Corp. v. Columbia Broadcasting System, Inc.*, 415 U.S. 394 (1974), the Supreme Court held that community antenna television ("CATV") systems -- which captured public television broadcasts with antennas set on hills and

---

[12]     While "the public" and "members of the public" are undefined, some guidance is provided by the performance clause, which defines "[t]o perform or display a work 'publicly'" as "to perform or display it at a place open to the public or at any place where *a substantial number of persons outside of a normal circle of a family and its social acquaintances* is gathered."  17 U.S.C. § 101 (emphasis added).

-10-

retransmitted them to their subscribers without a license --
were not "performing" the works and thus were not committing
copyright infringement.  Congress, however, expressly
rejected this outcome when it passed the 1976 Copyright Act.
*See Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 709
(1984).  It revised the definitions of "perform" and
"publicly" in the 1976 Act specifically to render the CATV
systems' unlicensed retransmissions illegal.  *See Sony Corp.*
*of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 469
n.17 (1984); H.R. Rep. No. 94-1476, at 63, *reprinted in* 1976
U.S.C.C.A.N. 5659, 5677 ("[A] cable television system is
performing when it retransmits the broadcast to its
subscribers . . . .").

Congress was not just concerned about the then-
newly-emerging CATV systems.  Rather, it broadly defined the
term "transmit" to ensure that all future technological
advances would be covered.  It explained that:

> The definition of "transmit" . . .
> is broad enough to include all
> conceivable forms and combinations
> of wires and wireless communications
> media, including but by no means
> limited to radio and television
> broadcasting as we know them.  Each
> and every method by which the images
> or sounds comprising a performance
> or display are picked up and

> conveyed is a "transmission," and *if*
> *the transmission reaches the public*
> *in [any] form*, the case comes within
> the scope of clauses (4) or (5) of
> section 106.

H.R. Rep. No. 94-1476, at 64, *reprinted in* 1976 U.S.C.C.A.N. at 5678 (emphasis added). Congress also specified that a public performance could be received in different places and at different times. *Id.* at 64-65, *reprinted in* 1976 U.S.C.C.A.N. at 5678. Congress thus made clear its intent to require a license for "[e]ach and every method by which the images or sounds comprising a performance or display are picked up and conveyed" -- "if the transmission reaches the public." *Id.* Hence, no matter how Aereo's system functions as a technical matter, because its unlicensed retransmissions reach the public, it is surely engaging in copyright infringement as Congress intended the statute to be interpreted.

## III. Cablevision *Was Wrongly Decided*

The panel majority's decision is based entirely on *Cablevision*. In my view, however, as some of the broadcasters argue, *Cablevision* was wrongly decided. Of course, I was the district judge in *Cablevision*, and I recognize that the panel was bound by the Court's decision in *Cablevision*, to the extent the decision is controlling.

But rehearing these cases *en banc* would also give the Court the opportunity to reconsider *Cablevision*.

*Cablevision* involved a cable operator (Cablevision) with licenses to retransmit broadcast and cable programming to its paying subscribers. *Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.*, 478 F. Supp. 2d 607, 610 (S.D.N.Y. 2007), *rev'd sub nom. Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008). Television content providers sought to enjoin Cablevision's Remote Storage Digital Video Recorder system (the "RS-DVR"), which allowed customers to record Cablevision's licensed live retransmissions with equipment located at Cablevision's facilities and then to play back those programs on their home television sets. *Cablevision*, 536 F.3d at 124-25. In essence, the RS-DVR functioned just like a set-top digital video recorder ("DVR"), except that Cablevision had to transmit the copies from its remote facility to the user's household. *See id.* The content providers argued that Cablevision needed additional licenses to do so because it was transmitting their copyrighted content to the public. *Twentieth Century Fox Film Corp.*, 478 F. Supp. 2d at 609. This Court rejected that argument "[b]ecause each RS-DVR playback transmission is made to a single subscriber using a single unique copy produced by

-13-

that subscriber . . . [and thus] such transmissions are not performances 'to the public.'"  *Cablevision*, 536 F.3d at 139.

Since that decision was filed in 2008, *Cablevision*'s interpretation of the transmit clause has been the subject of much academic criticism.[13]  Even the United

_____

[13]    *See, e.g.*, 2 Paul Goldstein, *Goldstein on Copyright* § 7.7.2, at 7:168 (3d ed. Supp. 2012) ("The error in the Second Circuit's construction of the transmit clause was to treat 'transmissions' and 'performance' as synonymous, where the Act clearly treats them as distinct -- and different -- operative terms."); Daniel L. Brenner & Stephen H. Kay, ABC v. Aereo, Inc.: *When Is Internet Distribution a "Public Performance" Under Copyright Law*, Intell. Prop. & Tech. L.J., Nov. 2012, at 12, 15 ("In a world of digital server technology, why should infringement turn on whether the defendant uses a less efficient, separate copy system than using a common master copy for each customer requesting one?"); Jane C. Ginsburg, *Recent Developments in US Copyright Law -- Part II, Caselaw:  Exclusive Rights on the Ebb?* 26 (Columbia Pub. Law & Legal Theory Working Papers 2008), *available at* http://lsr.nellco.org/cgi/viewcontent.cgi?article =1050&context=columbia_pllt [hereinafter Ginsburg, *Recent Developments*] ("The phrase 'members of the public capable of receiving the performance' is not intended to *narrow* the universe of 'the public.'  On the contrary, its role is to clarify that a transmission is still 'to the public' even if its receipt is individualized."); Jane C. Ginsburg, WNET v. Aereo:  *The Second Circuit Persists in Poor (Cable)Vision*, Media Inst., Apr. 23, 2013, www.mediainstitute.org/IPI/2013/042313.php [hereinafter Ginsburg, *Poor (Cable)Vision*] ("[T]he decision offered a roadmap that would considerably undermine the public performance right, possibly evading its application to new business models for digital content delivery."); Jeffrey Malkan, *The Public Performance Problem in Cartoon Network LP v. CSC Holdings, Inc.*, 89 Or. L. Rev. 505, 532 (2010) ("The statute does not say 'capable of receiving the transmission.'  Switching the words 'performance' and 'transmission' changed the outcome of the case . . . ."); Mary Rasenberger & Christine Pepe, *Copyright Enforcement and Online File Hosting Services:  Have Courts Stuck the Proper Balance?*, 59 J. Copyright Soc'y U.S.A. 627, 693 (2012) ("The ability to hold a service directly liable for publicly performing copyrighted works online has also been severely curtailed by the potential loophole created by the Cablevision decision and its recent progeny, Aer[e]o.").

States, in its amicus brief opposing the grant of certiorari in *Cablevision*, argued that this portion of the decision "could be read to endorse overly broad, and incorrect, propositions about the Copyright Act."[14] Specifically, the government acknowledged the argument that *Cablevision* could be construed to authorize a legally "suspect" service "in which the subscriber 'will simply send an electronic request first to 'copy' and then to 'play' the desired work.'"[15] More recently, the Central District of California has declined to follow *Cablevision*, in a case involving a system "technologically analogous" to Aereo's system, after concluding that *Cablevision*'s "focus on the uniqueness of the individual copy from which a transmission is made is not commanded by the statute." *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, No. CV 12-6921, 2012 WL 6784498, at *1, *3-5 (C.D. Cal. Dec. 27, 2012), *appeal docketed sub nom.*, *Fox Television Stations, Inc. v. Aereokiller, LLC*, No. 13-55156 (9th Cir. filed Jan. 25, 2013).

---

[14] *See* Brief for the United States as Amicus Curiae at 6, *Cable News Network, Inc. v. CSC Holdings, Inc.*, 129 S. Ct. 2890 (2009) (No. 08-448), 2009 WL 1511740 [hereinafter "U.S. *Cablevision* Amicus Br."].

[15] *Id.* at 21. The government nonetheless opposed the granting of certiorari because it believed the procedural posture of the case made it "an unsuitable vehicle for clarifying the proper application of copyright principles to technologies like the one at issue." *Id.* at 6.

These criticisms are well-founded.  In my opinion, the Court should take this opportunity to reconsider *Cablevision*'s interpretation of the transmit clause because the decision conflicts with the text of the statute in the following ways.

## 1.    *"Transmission" Instead of "Performance"*

First, *Cablevision* held that "the transmit clause directs us to identify the potential audience of a given transmission" and if the "transmission is made to a single subscriber using a single unique copy produced by that subscriber," then the transmission is a private performance because no one else can receive it.  *Cablevision*, 536 F.3d at 139.  In reaching this conclusion, this Court erroneously conflated the phrase "performance or display" with the term "transmission," shifting the focus of the inquiry from whether the transmitter's audience receives the same content to whether it receives the same transmission.[16]

---

[16]    *See* Malkan, *supra* note 13, at 536 ("[E]ven though the transmit clause refers, as [*Cablevision*] put it, to 'the performance created by the act of transmission,' a transmission and a performance remain, technically and legally, two distinct things.  The difference between them is that a transmission is the medium through which a performance is delivered 'to the public.'  This is why there may be more than one transmission of the same performance, that is, why members of the public may receive a public performance at 'different times.'" (citations omitted)).

This Court in *Cablevision* reasoned that "[t]he fact that the statute says 'capable of receiving the *performance*,' instead of 'capable of receiving the *transmission*,' underscores the fact that a transmission of a performance is itself a performance." *Cablevision*, 536 F.3d at 134 (emphasis added). But unless a contrary result is readily apparent, we generally presume Congress intends different terms in the same statute to have different meanings. *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 825 (2013). Here, there is no reason to assume Congress intended "performance" and "transmission" to have the same meaning. Although Congress defined "[t]o perform . . . a work 'publicly'" as "to transmit . . . to the public," this is the definition of "publicly," not "perform." *See* 17 U.S.C. § 101. Neither "to perform"[17] nor "to display"[18] is defined as "to transmit." *See id.* In fact, like "publicly," the definition of "to transmit"[19]

---

[17] "To 'perform' a work means to recite render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible." 17 U.S.C. § 101.

[18] "To 'display' a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process or, in the case of a motion picture of other audiovisual work, to show individual images nonsequentially." 17 U.S.C. § 101.

[19] "To 'transmit' a performance or display is to communicate it by any device or process whereby images or sounds

also distinguishes the "performance or display" from the process by which they are transmitted.  *See id.*  Even within the transmit clause itself, it would be counterintuitive to conclude that "transmission" is synonymous with "performance" because "the members of the public capable of receiving *the performance or display* . . . [can receive it] in the same place or in separate places and at the same time or at different times."  *Id.* (emphasis added).  It is difficult to imagine a single transmission capable of reaching people "in separate places" and "at different times."[20]

---

are received beyond the place from which they are sent."  17 U.S.C. § 101.

[20]     As Professor Jane C. Ginsburg has noted:

> Reading the statute to equate "transmission" with "performance" reads "different times" out of the statute. Once one recognizes that it is not possible for the two people to receive the *same transmission* "at different times," then it becomes clear that the "public" character of the transmission cannot turn on capacity to receive a transmission.  Rather, what makes a transmission, whether simultaneous or individualized on-demand, and whatever the number of source copies, "public" is its communication to "*members* of the public."

Ginsburg, *Poor (Cable)Vision*, *supra* note 13.

Thus, there is no indication Congress meant anything other than what it said: the public must be capable of receiving the *performance or display*, not the *transmission*. All that matters is whether the transmitter is enabling members of the public to receive the copyrighted work embodied in the *performance or display*, not whether they can receive the same legally insignificant *transmission*. *See Fox Television Stations, Inc.*, 2012 WL 6784498, at *4 ("Very few people gather around their oscilloscopes to admire the sinusoidal waves of a television broadcast *transmission*."). It makes no difference whether each member of the public receives the work by means of several individualized, asynchronous transmissions or a single, shared transmission.

### 2. *Aggregation and "Copies"*

Second, having conflated the terms "performance" and "transmission," the Court tried to accommodate the problematic "in separate places" and "at different times" language. By focusing on the unique transmission, *Cablevision* first discerned a rule that individualized transmissions should not be aggregated when determining whether a transmission is a public performance. *See Cablevision*, 536 F.3d at 138. The Court then recognized an

-19-

exception to that rule, however, when multiple private transmissions are made from the same copy of the work. *See id.* According to this exception, "*if the same copy* of a given work is repeatedly played (*i.e.*, 'performed') by different members of the public, albeit at different times, this constitutes a 'public' performance." *Id.* (alteration and internal quotation marks omitted) (quoting 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 8.14[C][3], at 8-142 (2007)); *see also WNET, Thirteen*, 712 F.3d at 688-89 & n.11 (explaining that *Cablevision*'s "exception to this no-aggregation rule," although "in some tension" with the Court's focus on the particular transmission, is "a way to reconcile the 'different times' language" that *Cablevision* otherwise "would essentially read out" of the statute).

The Court derived these principles from a Third Circuit case and a treatise, even though -- as the Court acknowledged -- neither source "explicitly explain[ed] *why* the use of a distinct copy affects the transmit clause inquiry." *Cablevision*, 536 F.3d at 138 (citing *Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 159 (3d Cir. 1984); 2 Nimmer on Copyright § 8.14[C][3]). Nevertheless, the Court agreed with "their intuition"

-20-

because "the use of a unique copy may limit the potential audience of a transmission." *Id.* Perhaps when it was more costly to make copies, the use of a unique copy could limit a transmitter's potential audience, but advancements in technology have rendered such reasoning obsolete.[18]

But even assuming this logic were still to hold true today, it ignores the fact that the definition of "to perform . . . a work 'publicly'" does not use the terms "copy" or "copies." Nor does the legislative history. *See Fox Television Stations*, 2012 WL 6784498, at *3-4. If Congress had intended the definition to turn on whether a unique copy was used, it knew how to say so. Indeed, Congress defined "copies" in the same section of the Copyright Act. *See* 17 U.S.C. § 101. Moreover, it defined that term as "material objects . . . in which a work is *fixed*," and it included the following sentence in the definition of "fixed": "A work consisting of sounds, images, or both, that are being *transmitted*, is 'fixed' for purposes of this title if a fixation of the work is being

---

[18] *See* Dennis S. Karjala, *"Copying" and "Piracy" in the Digital Age*, 52 Washburn L.J. 245, 263 (2013) ("In the early days of digital technology, when memory was costly, such designs may have been prohibitively expensive, but now that memory is cheap, they simply become technologically inefficient or inelegant.").

-21-

made simultaneously with its *transmission*." *Id.* (emphases added).  In other words, Congress plainly envisioned transmissions that did not involve any copies.[19]  Thus, it is unlikely that Congress intended the transmit clause inquiry to turn on the existence of "copies."  *See Fox Television Stations*, 2012 WL 6784498, at *4 ("*Cablevision*'s focus on the uniqueness of the individual copy from which a transmission is made is not commanded by the statute.").

### 3.  *"Transmission" Instead of "Transmitting"*

Third, the problem of determining which individual transmissions to aggregate only arises because the Court disaggregated the act of transmitting into isolated transmissions.  The Copyright Act does not use the *noun* "transmission," nor the *nouns* "public performance" nor "private performance," but instead uses the *verbs* "to perform . . . a work 'publicly'" and "to transmit . . . to the public."  17 U.S.C. § 101.  It is the transmitter's *actions* that render him liable, not his individual

---

   [19]   *Compare* H.R. Rep. No. 94-1476 at 63, *reprinted in* 1976 U.S.C.C.A.N. at 5676-77 ("[A] sing[er] is performing when he or she sings a song; a broadcasting network is performing when it transmits his or her performance (whether *simultaneously or from records*) . . . ." (emphasis added)), *with Cablevision*, 536 F.3d at 137 ("[N]o transmission of an audiovisual work can be made, *we assume*, without using a copy of that work . . . ." (emphasis added)).

*transmissions*,[20] and he can "transmit" by sending one transmission or multiple transmissions.  Thus, there is no textual reason why each individual transmission must be able to reach the public.  Based on the plain language, it is sufficient if the actor is "transmit[ting]" the same performance or display and his recipients are members of the public.[21]

### 4.   *Transmit Clause, but not Performance Clause*

Fourth, the Court erred by looking at the transmit clause in isolation, rather than in context with the performance clause.  *See Cablevision*, 536 F.3d at 134. Congress clearly meant for the two clauses to work in conjunction.  The performance clause covers the act of performing or displaying a work at a single place open to the public, while the transmit clause covers the act of transmitting the work either to such a public place or to any other place (or places) where the public can receive it. *See* 17 U.S.C. § 101.  Thus, only the performance clause requires that the public be able to view the performance or

---

[20]   *See* H.R. Rep. No. 94-1476 at 63, *reprinted in* 1976 U.S.C.C.A.N. at 5676-77 ("[T]he concepts of public performance or public display cover not only the initial rendition or showing, but also *any further act* by which that rendition or showing is transmitted or communicated to the public." (emphasis added)).

[21]   *See* Ginsburg, *Recent Developments*, *supra* note 13, at 26.

-23-

display at the same time and place; the transmit clause expressly removes that limitation.[22]  Moreover, the performance clause identifies at least one group included within the meaning of "the public":  "a substantial number of persons outside of a normal circle of a family and its social acquaintances."  *Id.*  This explanatory phrase, turning on the relationship between the transmitter and the recipients, accords with the plain meaning of "the public," *see WNET, Thirteen*, 712 F.3d at 698-99 (Chin, J., dissenting), and provides a textual basis for distinguishing between public and private performances.[23]

**5.  *"Copies" Instead of "Any Device or Process"***

Finally, the Court's reliance on "copies" ignores Congress's specification that transmitting "to the public, *by means of any device or process*," constitutes performing

---

[22]     *See* H.R. Rep. No. 94-1476 at 64, *reprinted in* 1976 U.S.C.C.A.N. at 5678 ("Clause (2) of the definition of 'publicly' in section 101 makes clear that the concepts of public performance and public display include not only performances and displays that occur initially in a public place, but also acts that transmit or otherwise communicate a performance or display of the work to the public by means of any device or process.").

[23]     *See* H.R. Rep. No. 94-1476 at 64, *reprinted in* 1976 U.S.C.C.A.N. at 5678 ("One of the principal purposes of the [performance clause] definition was to make clear that . . . performances in 'semipublic' places such as clubs, lodges, factories, summer camps, and schools are 'public performances' subject to copyright control.  The term 'a family' in this context would include an individual living alone, so that a gathering confined to the individual's social acquaintances would normally be regarded as private.").

the work publicly. 17 U.S.C. § 101 (emphasis added). Not only is the word "any" naturally expansive, *see United States v. Gonzales*, 520 U.S. 1, 5 (1997), but Congress also defined both "device" and "process" broadly as "one[s] now known or later developed," 17 U.S.C. § 101. It is obvious from the text that Congress intended "any device or process" to have the broadest possible construction so that it could capture technologies that were unimaginable in 1976.[24] Even if the statute were ambiguous in this regard, the legislative history removes all doubt about Congress's intentions.[25]

Furthermore, Congress used this same expansive language to protect against unforeseen methods of *copying* copyrighted works. *See* 17 U.S.C. § 101 (defining "[c]opies" as "material objects . . . in which a work is fixed *by any method now known or later developed*" (emphasis added)). It is inconceivable that Congress would use these broad terms

---

[24] *See David v. Showtime/The Movie Channel, Inc.*, 697 F. Supp. 752, 759 (S.D.N.Y. 1988) ("[I]t would strain logic to conclude that Congress would have intended the degree of copyright protection to turn on the mere method by which television signals are transmitted to the public."); *see also Nat'l Football League v. PrimeTime 24 Joint Venture*, 211 F.3d 10, 12-13 (2d Cir. 2000) (adopting *David*'s reasoning).

[25] *See* H.R. Rep. No. 94-1476 at 64, *reprinted in* 1976 U.S.C.C.A.N. at 5678 (explaining that "transmit" was defined broadly to "include all conceivable forms and combinations of wires and wireless communications media, including but by no means limited to radio and television broadcasting as we know them").

to protect against future methods of both copying and transmitting, but also intend to create a loophole by which transmitters can avoid liability by *first* copying works and *then* transmitting the copies (rather than originals) to individual members of the public.[26]  Such a system is still just a "device or process" by which the transmission is made to the public.

*Cablevision*'s focus on whether the public is capable of receiving each individual transmission and the technicalities of how that transmission process works is incompatible with the statute.  By declining to rehear these cases *en banc*, the Court misses an opportunity to reconsider *Cablevision* and correct its misinterpretation of the Copyright Act.

## IV.  Cablevision *Should Not Be Extended*

Even assuming that *Cablevision* was correctly decided, its holding should be limited to its facts. *Cablevision* primarily reasoned that the RS-DVR was no different than a set-top DVR, and that Cablevision should not have additional liability for transmitting the RS-DVR

---

[26]    *See* U.S. *Cablevision* Amicus Br., *supra* note 14, at 21 (considering the argument that *Cablevision* permitted companies to "provide [video on-demand] services without a license by establishing a system in which the subscriber 'will simply send an electronic request first to 'copy' and then to 'play' the desired work'" and concluding that the "legality of [this] conduct would be suspect at best").

copies to its subscribers when it already paid licensing fees to retransmit the material live. The *Cablevision* panel never considered how its rationale might apply to a device like Aereo's, which uses individual antennas and unique copies as a means to avoid paying licensing fees altogether. The Court did, however, "emphasize" that its holding "does not generally permit content delivery networks to avoid all copyright liability by making copies of each item of content and associating one unique copy with each subscriber to the network, or by giving their subscribers the capacity to make their own individual copies." *Cablevision*, 536 F.3d at 139. Likewise, when the United States opposed the grant of certiorari in *Cablevision*, it argued that "the court of appeals' analysis of the public-performance issue should not be understood to reach . . . other circumstances beyond those presented."[27] Accordingly, *Cablevision* should never have been extended to Aereo's unlicensed service. Even Cablevision itself has submitted an amicus brief in these cases arguing that *Cablevision* should not be extended to the facts here.

Admittedly, there are some technological similarities between the RS-DVR and Aereo's system, but there are also important differences. Most significantly,

_____

[27]     U.S. *Cablevision* Amicus Br., *supra* note 14, at 6, 21.

Cablevision *paid* statutory licensing and retransmission consent fees for the content it retransmitted, while Aereo pays no such fees. Cablevision subscribers already had the ability to view television programs in real-time through their authorized cable subscriptions, and the RS-DVR was merely a supplemental service that allowed subscribers to store that authorized content for later viewing. The RS-DVR system made copies only as part of its storage and time-shifting functions, and the copies were made only of material that Cablevision already had a license to retransmit to its subscribers. In contrast, no part of Aereo's system is authorized. Instead, its storage and time-shifting functions are an integral part of an unlicensed retransmission service that captures broadcast television programs and streams them live over the Internet. It produces copies not to supplement its authorized retransmission service, but to *enable* it to retransmit programming to its subscribers without a license. Hence, Aereo's system of antennas and copies are the *means* by which Aereo transmits copyrighted broadcasts to the public. *See* 17 U.S.C. § 101.

By extending *Cablevision*, the panel decision eviscerates the Copyright Act: although it is generally unlawful to capture and retransmit public television over

the Internet without a license, *see ivi*, 691 F.3d at 278, entities may now do so as long as they utilize individual antennas and unique copies, even though the antennas and copies functionally are unnecessary, and even though the programs are retransmitted to members of the public, *see WNET, Thirteen*, 712 F.3d at 689-94. These sorts of legal pronouncements, based solely on the technology of the day, are sure to be short-lived. "Instead of the law adapting itself to meet the needs of society under conditions of new technology, these judicial interpretations [merely] push technology in odd directions as systems engineers seek to avoid falling on the wrong side of what is essentially an arbitrary line." Dennis S. Karjala, *"Copying" and "Piracy" in the Digital Age*, 52 Washburn L.J. 245, 263 (2013). This is precisely what has happened here. *Cablevision*'s reliance on unique copies in 2008 has opened the door in 2013 for Aereo to design a Rube Goldberg-like contraption using miniature antennas and unique copies to flout Congress's licensing regime.

Congress purposely declined to identify specific technologies or processes in the Copyright Act because it realized that such definitions would be destined for obsolescence. Indeed, the hardware and technology in *Cablevision* and the antennas and wiring at issue here are

fast becoming obsolete in this era of the "Cloud" and wireless technology. Courts should follow Congress's lead and resist the urge to look "under the hood" at how these processes technically work. Instead, our inquiry should be a functional one, as set forth in the statute: does the device or process transmit a copyrighted performance or display to the public? In Aereo's case, the answer is clearly yes.[28]

### CONCLUSION

As I wrote in my panel dissent, the majority's decision elevates form over substance. It holds that a commercial enterprise that sells subscriptions to paying strangers for a broadcast television retransmission service is *not* performing those works publicly. It reaches that conclusion by accepting Aereo's argument that its system of thousands of tiny antennas and unique copies somehow renders these transmissions "private." In my view, however, the system is a sham, as it was designed solely to avoid the

---

[28] *See* 17 U.S.C. § 101; H.R. Rep. No. 94-1476 at 64, *reprinted in* 1976 U.S.C.C.A.N. at 5678 ("Each and every method by which the images or sounds comprising a performance or display are picked up and conveyed is a 'transmission,' and if the transmission reaches the public in [any] form, the case comes within the scope of clauses (4) or (5) of section 106."); *see also Nat'l Football League*, 211 F.3d at 13 ("[T]he most logical interpretation of the Copyright Act is to hold that a public performance or display includes 'each step in the process by which a protected work wends its way to its audience.'" (citation omitted)).

reach of the Copyright Act and to take advantage of a perceived loophole in the law purportedly created by *Cablevision*. Both the majority's decision and *Cablevision*'s interpretation of the transmit clause are inconsistent with the language of the statute and congressional intent. This decision upends settled industry expectations and established law. It should not be permitted to stand, and the Court should have taken this opportunity to clarify that *Cablevision* does not provide "guideposts" on how to avoid compliance with our copyright laws. Because it declines to do so, I respectfully dissent.